Entered: August 20th, 2019
Signed: August 20th, 2019



ROBERT A. GORDON
U.S. BANKRUPTCY JUDGE

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| Sojourner Douglas College, Inc. | * | Case No. 18-12191-RAG |
| | | Chapter 11 |
| Debtor | * | |
| * * * * * * * | * | * * * * * |
| Michael Roblyer, Trustee of and on behalf of the Harrell S. Spruill Revocable Trust, *et al.* | * | |
| | * | |
| Plaintiffs | * | |
| v. | * | Adversary No. 18-00226 |
| Charles R. Goldstein, Chapter 11 Trustee, *et al.* | * | |
| | * | |
| Defendants | * | |
| * * * * * * * | * | * * * * * |

## MEMORANDUM OPINION IN SUPPORT OF ORDER
## GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
## <u>QUIETING TITLE AND DECLARING OWNERSHIP OF REAL ESTATE</u>

## I.     __Introduction__

The question presented by this Adversary Proceeding is whether, because there are no longer any traces of vigorous, intermittent, or even docile, agricultural or educational activities initiated or pursued by the Debtor/Defendant, Sojourner Douglas College, Inc. (Sojourner) upon the real estate known as the "Farm Property", the title to the real estate reverted, as a matter of Maryland law, to the Plaintiff, Michael Roblyer, Trustee of, and on behalf of, the Harrell S. Spruill Revocable Trust, and in turn to the co-Plaintiff, Kecia Johnson, the Grantor's heir, (collectively, Spruill Trust), notwithstanding Sojourner's pledge of the Farm Property to lender Revach, LLC (Revach) as collateral for a substantial loan.  Sojourner asserts that the pledge of the Farm Property was (and continues to be) an "educational purpose", sufficient to bar the operation of the subject reversionary clause.

There is no Maryland decision precisely on point and, as the Court previously suggested to the parties, the question – which is purely one of Maryland law – would ideally be left to the decisional wisdom of the Maryland Court of Appeals, via certification.[1]  Nevertheless, and in light of the parties' desire and consent to have the question resolved in this forum, the Court must resolve it with the conclusion that there are no material facts in dispute and because the reversionary condition has been triggered, and the use of the Farm Property as loan collateral

---

[1] The certification of an issue to a state's highest court is permitted via the Uniform Certification of Question of Law Act, codified in Maryland at Subtitle 6 of Title 12 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.  Md. Cts. & Jud. Proc. Code Ann. §§ 12-601 to 12-609.  This Court tries to be ever mindful of the jurisdictional boundaries identified in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) and *Stern v. Marshall*, 564 U.S. 462 (2011) and this seems to be just the type of case where those boundaries cry out for dispute resolution in a non-bankruptcy forum.  However, the Spruill Trust declined the Court's offer to seek certification and asked that the decision be made here.  Likewise, Sojourner and the Trustee, Charles A. Goldstein (Trustee), have not objected to the dispute being resolved in this forum.  Through their inaction, and acceptance of the certification turnabout described in Section II, the Court finds that the Trustee and Sojourner have impliedly consented to jurisdiction and the entry of a final judgment here and have waived any objection to the same.  December 18, 2018 Hearing Transcript at 6-8, 12-13.  Hence, the Court has done its level best to fortify its Maryland real estate law "hat" and provide a just resolution to the question posed.

constitutes neither an "agricultural" nor "educational purpose", the Farm Property has reverted to the Spruill Trust as a matter of law, and summary judgment should be granted in the Spruill Trust's favor.

## II.    Procedural Background

The main Bankruptcy, Case No. 18-12191, (Main Case) was voluntarily commenced by Sojourner on February 21, 2018.  On February 26, 2018, secured lender, 1880 Bank (1880), filed its Emergency Motion for Relief from the Automatic Stay of 11 U.S.C. §362 to Pursue the Appointment of a Receiver and/or a Foreclosure of Property (Lift Stay Motion) (Dkt. No. 16, Main Case).  On March 9, 2018, the same day that the Lift Stay Motion had already been scheduled to be heard, 1880 filed a Motion to Approve Consent Order Directing the Appointment of a Chapter 11 Trustee (Trustee Motion) (Dkt. No. 32, Main Case).  The thrust of the Trustee Motion was accepted by the Court during the Lift Stay Motion hearing, and a Consent Order Directing the Appointment of Chapter 11 Trustee was thereafter entered (Dkt. No. 49).  Immediately thereafter, Mr. Goldstein was appointed Chapter 11 Trustee (Dkt. No. 50) and he continues to act in that capacity.

This Adversary Proceeding was commenced on June 19, 2018 by the Spruill Trust's filing of the Complaint to Determine Ownership of Property Claimed by Debtor, against Sojourner and the Trustee.  Sojourner, filed its Answer on August 22, 2018 (Dkt. No. 17) and on September 14, 2018, the Trustee filed his Answer and Affirmative Defenses (Dkt. No. 24).  Five days later, on September 19, 2018, the Spruill Trust filed the Motion for Summary Judgment (SJ Motion) (Dkt. No. 25) that is resolved by this Opinion.  The Trustee and Sojourner together filed

an Opposition to the SJ Motion on October 17, 2018 (Dkt. No. 31) and the Spruill Trust filed its Reply on October 19, 2018 (Dkt. No. 34).[2]

A hearing was scheduled for November 14, 2018 to consider the SJ Motion and Opposition (Dkt. No. 41). However, without addressing the substance of the competing positions, the Court instead suggested that the best course might be to certify the dispute for resolution by the Maryland Court of Appeals. The proposal was made because (a) the merits of this dispute are governed exclusively by Maryland substantive law and (b) any connection to the Bankruptcy Code arises only by dint of the Debtor's decision to commence the Main Case: other than the unilateral selection of this forum, federal law plays no role in the dispute. After discussion, the parties agreed to this approach and December 7, 2018 was fixed as the deadline for them to submit a proposed opinion and order certifying the question presented. In the event the parties could not agree upon the language of the opinion and order, a hearing was scheduled for November 28, 2018 to resolve any differences.

November 28th came and went without any apparent dispute. However, on December 3, 2018, Counsel for the Spruill Trust submitted a letter requesting that the decision to certify the matter be "re-visited" and upon further review, undone. In support of this request, Counsel indicated that he had contacted the Maryland Court of Appeals and had come away with the understanding that even if the matter was handled as expeditiously as possible, a decision might not be forthcoming until 2020 at the earliest and, moreover, that it would cost significantly more to resolve the matter in that forum. As a result, a status conference was scheduled for December 18, 2018 (Dkt. No. 48) and after hearing from the parties, the decision was made to forgo

---

[2] From this point forward the Trustee and Sojourner will be collectively referred to as "Sojourner" unless the context requires otherwise.

certification.[3]  Hence, the SJ Motion and related papers were scheduled for hearing on February

19, 2019.  A hearing was held that day, the parties argued their positions and the matter was

taken under advisement (Dkt. No. 51).

### III.    Background, and Facts not in Dispute[4]

The underlying real estate transaction, and the controlling grant language under review, is

described concisely in the Spruill Trust's Statement of Material Facts As To Which There Is No

Genuine Dispute (Dkt. No. 25-1), as follows:

> 1.    Prior to December 31, 2008, the [Spruill] Trust owned, and
> was in possession of, property in fee simple absolute
> located in Lothian, Anne Arundel County, Maryland, said
> property described in the land records of Anne Arundel
> County as follows: Lot 1, designated on a subdivision Plat
> of the Spruill Farm, said plat recorded in Plat Book 293,
> pages 1 and 2 of the Plat Records of Anne Arundel County
> (the "Property").  See Exhibit 1, Robyler Affidavit, May
> 10, 2017, at 2, ¶ 3.  See also Trustee's Answer to
> Paragraphs 7 and 8 of Complaint, ECF No. 24 at 2
> (admitting prior ownership).

> 2.    On or about December 31, 2008, the Trust conveyed the
> Property to [Sojourner] the conveyance document stating as
> follows:

> TO HAVE AND TO HOLD the property being conveyed
> unto the Grantee and to its successors and assigns, only so
> long as Grantee, its successors and assigns, uses the
> property for agricultural or educational purposes. In the
> event Grantee, its successors or assigns, does not use the

---

[3] Counsel for the Spruill Trust also indicated in the letter and at the status conference that his clients would relinquish their right to an appeal if the matter was kept in this forum.  However, the Court considers that concession unnecessary and unenforceable.

[4] Sojourner asserts that there may be a material dispute of fact because, (a) if the interpretation of the relevant language asserted by the Spruill Trust is given credence, that means the subject language is by definition ambiguous and the ambiguity must be resolved through a trial and (b) Sojourner may yet be able to successfully reorganize and thus retain its determinable fee, and that speculative "fact" should prevent summary judgment.  The Court has determined there is no ambiguity and the "potential" for reorganization is not determinative in light of the Farm Deed's express language and the automatic activation of the reverter clause which operates to exorcise the Farm Property's title from Sojourner without any further action by the Spruill Trust.

property for agricultural or educational purposes, the title to the property shall revert to Grantor if he is living on the date the property is not being used for agricultural or educational purposes by Grantee, or its successor or assigns, or if Grantor has passed away before that date, the title to the Property shall revert to the daughter of Grantor, Kecia S. Johnson ...[5]

See Exhibit 2, [Farm Deed].

3.      Debtor is not currently using the Property for agricultural or educational purposes, Exhibit 3, excerpt of Transcript of 341 hearing, (Property not being used to educate at risk boys in 2018, nor 2017, nor 2016, last time so used "could have been around 2015"); Exhibit 4, Simmons affidavit at 4, ¶ 11 ("middle School/Farm interaction last (sic) until approximately June 30, 2013"), has not used the Property for agricultural purposes since December 2014, Exhibit 3, 341 Transcript (agricultural activity stopped around December 31, 2014); see also Exhibit 5, Roblyler (sic) Affidavit (affying (sic) that pictures attached to Exhibit 1 substantially represent condition of Property).

President Charles W. Simmons of Sojourner submitted an affidavit (Simmons Affidavit) in the parties' virtually identical, pre-bankruptcy litigation commenced in the Circuit Court for Anne Arundel County[6] and the Spruill Trust relied upon the Simmons Affidavit in its entirety, in seeking summary judgment. It concisely encapsulates the material facts and core issue to be determined. Moreover, every word stands as an evidentiary admission by Sojourner.[7] Hence, it is reprinted verbatim here:

1.      I am the President of [Sojourner]…, the Defendant in the above-captioned [A.A. County] action. This Affidavit is submitted by me in opposition to the motion of Plaintiff, Michael Roblyer, for summary judgment. This submission is made, in part, in accordance with Maryland Rule 2-501,

---

[5] The Deed (Farm Deed) was recorded on February 25, 2009 in the Anne Arundel County (A.A. County) land records at Book No. 20729 at page 202-04.

[6] That civil action was titled *Michael Roblyer, et al., v. Sojourner Douglas College, Inc. and Revach, LLC*, Case No. C-02-CV-17-001406. Before it was resolved, the Main Case was filed.

[7] *See* Fed. Rule of Evid. 801(d).

to controvert material facts pertaining to the Plaintiff s claims.  The facts and matters set forth herein are based upon my personal knowledge, unless otherwise indicated, and I am competent to testify thereto.

2.      [Sojourner] is a private independent Section 50l (c)(3) institution that offers Baccalaureate and Masters Degrees with a focus on the Applied Arts and Sciences.  Students at [Sojourner] are predominately African-American adults (average age 38 years old) with years of experience who are passionate about being social change agents in their communities.  In the early 1970s, community groups, leaders, and the local Council of Churches began discussing the educational needs of their residents and came together to form Adult Education, Inc.  Working with Antioch College, an agreement was reached to found the Homestead-Montebello Center of Antioch College, which would serve the African-American community by working toward community self-reliance and provide a "culturally pluralistic learning environment."  Beginning with 35 students and an all-volunteer faculty and staff, the Homestead-Montebello Center was established in the fall of 1972 under an agreement with Antioch that the Homestead-Montebello Center would eventually "spin off" to become independent.

3.      On or about December 31, 2008, the Farm [Property] … was conveyed to [Sojourner].  [Sojourner] used the property in question for educational and agricultural purposes.  With regard to agricultural purposes, [Sojourner] paid two (2) full-time farm workers to manage the Farm [Property] to include planting, harvesting the crops and distributing the produce to [Sojourner's] campuses and to organizations serving and feeding the poor until approximately December 31, 2014.

4.      The educational mission of [Sojourner] is dependent upon its accreditation as an institution of higher learning, allowing its students to secure federal student loans to pay its charged tuition.  Under federal law, federal student loans are available only for tuition to attend institutions accredited by a recognized accreditation agency.  Since its creation, [Sojourner] was accredited by the Middle States Commission on Higher Education ("MSCHE").

5.      [Sojourner's] interaction with MSCHE regarding concerns about accreditation begin with a warning letter from MSCHE dated November 18, 2011, following the Periodic Review Report ("PRR") of August 1, 2011.

6.      After several years of effort by [Sojourner] to meet MSCHE's concerns were unsuccessful, the event directly leading to the dispute is reflected in a Commission Action notice of March 6, 2014.

7.      The Commission Action notice of March 6, 2014 required [Sojourner] to show cause by September 1, 2014, as to why accreditation should not be removed.  This notification was formal commencement of a process in which removal of accreditation was an identified outcome of the process.  In the Notice, MSCHE requested a substantive report from [Sojourner] regarding six (6) specified items relating to the financial stability of [Sojourner].

8.      Beginning in March 2011, [Sojourner's] accreditation was under review by MSCHE because of issues, among others, relating to concern about the financial stability of [Sojourner].

9.      On September 1, 2014, [Sojourner] presented to MSCHE the Substantive Report and Turnaround Plan called for in the Commission Action of March 6, 2014.  The effort undertaken by [Sojourner] to respond to the request of MSCHE was substantial.  The actions proposed in the report included workforce reductions in pay effecting savings projected to be more than $3.6 million, expanded efforts to sustain and increase student enrollments to tap new student markets outside the United States as well as efforts to improve student retention, and the proposed expansion of college offerings to sustain expanded revenues.  In addition, [Sojourner] negotiated a sale/leaseback agreement to liquidate its real estate holdings to provide the cash to address its indebtedness, negotiated an arrangement with the IRS and state tax authorities to remove impediments to the various plans for stabilizing [Sojourner's] financial condition.  In developing the response to the Commission Action of March 6, 2014, [Sojourner] included in the report, as MSCHE requested, a projection of multiyear budgets together with enrollment projections, which factoring in the projected impact of [Sojourner] proposed changes, many subject to MSCHE

approval, were projected to yielded (sic) an end to budget deficits for [Sojourner] as early as 2015. The substantive plan incorporated a number of [Sojourner's] community efforts as a future source of revenue from the development of its human development platform, The Promissorium ™.

10.    Following presentation of [Sojourner's] September 1, 2014 Substantive Report and Turnaround Plan (Attachment F to my original Declaration), MSCHE sent a visitation team to [Sojourner] on September 22-23, 2014. On October 23, 2014, I communicated by letter to Elizabeth Sibolski, President of MSCHE, [Sojourner's] response to the report of the MSCHE visitation team, "to reinforce that [Sojourner] remains worthy of continued accreditation." A true copy of that response is appended hereto as Attachment 1. In that response reinforcing that [Sojourner] has satisfied the accreditation requirement that its financial condition is sustainable, I identified among [Sojourner's] assets the Spruill Farm property that is the subject of this litigation. Accordingly, [Sojourner] used the property for the purpose of retaining its accreditation as an institution of higher learning to meet an accreditation requirement that [Sojourner's] financial condition be sustainable.

11.    Concurrently, [Sojourner] used the Farm [Property] for the express educational purpose of supporting the offering and operation of the "Middle College," designed for "at-risk" [A.A. County] Public Middle School boys. [Sojourner] tutored these at-risk boys in their academic pursuits as well as took them to the Farm [Property] on a regular basis to instruct them in agricultural and food science. This Middle School/Farm interaction lasted until approximately June 30, 2013.

12.    On or about January 22, 2015, [Sojourner] used the Farm [Property] for educational purposes by offering it as collateral in a transaction with [Revach], designed to maintain and stabilize financially the educational operation of [Sojourner] by borrowing money against the property in question in order to maintain [Sojourner's] educational operations.

13.    [Sojourner's] transaction with [Revach], was known to the Plaintiff in this action since before the time this summary judgment motion was filed and its requests for discovery were served. [Revach], is a defendant who moved to

intervene in this action in or just prior to November 2017, using its interest arising from the transaction in question to justify its intervention in the litigation.

14.    Since December 31, 2014, through the present date, [Sojourner] continues to rely upon its title to the property in question as security for a plan to reorganize its operations in an effort to secure again accreditation from MSCHE to continue its operation as an educational institution.  For the purpose of continuing its educational mission despite its financial difficulties, [Sojourner] has consulted the same attorneys who represented Morris Brown University of Atlanta, Georgia, and who assisted that institution successfully to navigate similar financial difficulties to resume operation as an educational institution.  In consultation with counsel, [Sojourner] is currently developing a reorganization plan in which it will continue to rely upon the property in question as security to effectuate the reorganization to be developed.

15.    Under the circumstances set forth above, [Sojourner] has continued to use the property in question for educational purposes uninterrupted since the time the property was conveyed to [Sojourner] on December 31, 2008.

Spruill Trust Smt. Mat. Facts, Exh. 4, Simmons Affidavit.

After the commencement of the Main Case, Dr. Simmons was examined under oath at the

11 U.S.C. § 341(a)[8] meeting of creditors (Creditors' Meeting) by Counsel for the Spruill Trust.

Relevant portions of his testimony are reprinted here:

THE JUDGE [sic] (UST Representative)[9]:  All right, we're back on the record in the [Sojourner] First Meeting of Creditors and we've just opened the meeting up for questions by creditors.  You want to enter an appearance for me?

---

[8] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code), found at Title 11 of the United States Code and all rule citations are to the Federal Rules of Bankruptcy Procedure (Rules).

[9] The use of the honorific, "Judge" by the transcriber is, in all likelihood, incorrect, and with certainty as to the author of this Opinion.  The person mis-identified as "Judge" was probably the representative of the United States Trustee's Office (UST), the body statutorily charged with conducting the meeting.  *See* §341(a) ("Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors."); §341(c) ("The court may not preside at, and may not attend, any meeting under this section including any final meeting of creditors.").

MR. LIPSETTS:  My name is Eric Lipsetts.  I represent the [Spruill Trust].

[UST Representative]:  Excellent, thank you.

MR. LIPSETTS:  Dr. Simmons, since there was talk about the [Farm Property], if I could refer to Page 3 of your Document No. 37, Judicial Form 206A/B and Line No. 55.5.

When you talk about that particular property, you're talking about the Spruill Farm as it is commonly known; is that right?

[Dr. Simmons]:  That's correct.

[UST Representative]:  Can you spell Spruill for me?

MR. LIPSETTS:  S- P- R- U- I- L- L.

BY MR. LIPSETTS:
Q.  And just to be - - just to wrap this up for what it's worth, here again in Document No. 38, Line No. 2.9 again referring to 5963 Franklin Gibson Road, there again you're talking - - in your schedules here, you're talking about the Farm Property, right?

[Dr. Simmons]:  Yes.

Q.  Okay, great.  Now, can you mark Exhibits or can I just show?

[UST Representative]:  No, yes (sic).

BY MR. LIPSETTS:
Q.  I am going to show you a deed and ask you is it pursuant to this particular Deed that says [Sojourner] obtained its interest in the Farm Property.

MR. KIMIT [Sojourner's Counsel]:  If you know.

[Dr. Simmons]:  I don't have the slightest idea.  Let me see what this is.

BY MR. LIPSETTS:
Q.  The Deed's dated December 31st, 2008.  And the relevant clause, just to refresh your recollection, the relevant clause is the one at the bottom to have and to hold the property hereby conveyed unto grantee, skipping, only so long as the Grantee and

11

successor in this sign (sic) uses the property for agricultural educational purposes.

MR. KIMIT:  So, what is your question?

BY MR. LIPSETTS:
Q.  Is this the Deed by which [Sojourner] got that fee simple interest that it listed in it's . . .

[Dr. Simmons]:  Talking about so long as the successor uses it for agricultural or educational purposes.

MR. KIMIT:  But, if you know.

BY MR. LIPSETTS:
Q.  Well, prior to December 31st, 2008, did [Sojourner] have an interest in the property, the [Farm Property]?

[Dr. Simmons]:  We may have had an interest, we may not have had -- I mean, we may not have had a Deed in interest, we. . .

Q. I meant a legal interest.

A.  Probably not.

*        *        *

Q.  Do you remember that just within the past 45 minutes there was reference to [A.A. County] litigation regarding [Sojourner's] interest in that [Farm Property]?

[Dr. Simmons]:  …[Y]es, I remember that.

Q.  …  And do you remember that in the [A.A. County]  litigation that you submitted in the [sic] [Simmons Affidavit]?

A.  I remember that.

Q.  …  Now, just to clear up one or two things:  You testified here about providing services to at–risk children.  And if I could call your attention here to what you wrote in Paragraph 11 [of the Simmons Affidavit], and I believe your last comment there is that the last time you or that, that program was closed down on June 20th, 2013, maybe June 30th, but whatever date there, 2013 being the at (sic) - - being the date that I'm really looking at.
Do you see what you wrote?

12

A.  I see that.

Q.  So, when you were talking about providing tutoring at-risk boys for free in groups of 10 to 15, did any of that happen after June 30th, 2013?

A.  We had a -- we work with another group.  I'll have to provide you with their names that worked with the -- worked the farm with the young boys.

Q.  And so, are you telling me that after 2013, June 30 of 2013 that [Sojourner] continued to bring at risk boys?

A.  Right, I'm sure of that; yes, that's my understanding.

Q.  How come you didn't mention that in [the Simmons Affidavit]?

A.  I don' t know.

Q.  …  When was the last time, the last time that [Sojourner] did anything with these at-risk boys?

A.  I'd have to go back and look at the record, but my understanding it was beyond 2013.

Q.  Let's work back a little bit:  It hasn't been in 2018, has it?

A.  No.

Q.  It hasn't been in 2017, has it?

A.  No.

Q.  It hasn't been in 2016?

A.  It could have been around '15.

Q.  …  Now, the other thing that you say here regarding agricultural activity, can I call your attention to your Paragraph 3 and you indicate that agricultural activity stopped around June 30th, 2014.

A.  Right.

Q.  Pardon me, December 30th, 2014?

13

A.  December 31st, that's when we had to release the farmers that we were actually paying.

\*         \*         \*

Q.  … So, just to reiterate:  So since December 30th, 2014 through today, [Sojourner] has conducted no agricultural activity on the property; is that fair?

A.  We have not paid to have the property farmed.

Q.  Okay, has it been farmed under [Sojourner] auspistices (sic) post December 30th, 2014?

A.  No, when we were taking the children there, they were - - I never went with them but they were learning agricultural science. So, if that's farming, they were raising crops.

Q.  Okay, and when did that stop?

A.  I am not sure. I'm suggesting, I think it was around '15.

\*         \*         \*

BY MR. LIPSETTS:
Q.  Now, do you contend - - strike that question.
You secured the property, you gave Derivach, (sic) LLC a secured interest in the property in or about January of 2015; isn't that right?

A.  I'm not sure of the date on it.

\*         \*         \*

BY MR. LIPSETTS:
Q.  Okay.  Now, in the [A.A. County] litigation, which I have here, I'd be happy to refresh your recollection, you have indicated that you have used the property for educational purposes by taking out -- by securing the property with Revoch (sic) so you can use that money to fund education activities.  I believe that's in your Paragraph 14 [of the Simmons Affidavit].  Has that been the only way that [Sojourner] has used the property for agricultural educational purposes since January 1 of 2017?

\*         \*         \*

14

[UST Representative]:  You can tell him not to answer.  You can't tell him not to ask.

MR. KIMIT:  Don't answer the question.

[Dr. Simmons]:  I'm not gonna answer the question.  I've already answered the question.[10]

Spruill Trust Smt. Mat. Facts, Exh. 4, Transcript of First Meeting of Creditors at 2-11.

### IV.    Jurisdiction, Venue and Choice of Law

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (K) and (O).  The parties have expressly,

---

[10] The Court must pause from the dry, analytical exercise to extend praise for Sojourner's vision and legacy of teaching agricultural science to youngsters.  It is truly in keeping with the best the American Spirit has to offer, a spirit memorialized by Woody Guthrie in these lyrics:

> *From the high Canadian Rockies to the land of Mexico,*
> *City and the country, wherever you may go,*
> *Through the wild and windy weather, the sun and sleet and rain,*
> *Comes a-whistlin' through the country this Farmer-Labor train.*

> \*       \*       \*

> *There's lumberjacks and teamsters and sailors from the sea,*
> *There's farmin' boys from Texas and the hills of Tennessee,*
> *There's miners from Kentucky, there's fishermen from Maine;*
> *Every worker in the country rides that Farmer-Labor train.*

> \*       \*       \*

> *There's folks of every color and they're ridin' side by side,*
> *Through the swamps of Louisiana and across the Great Divide,*
> *From the wheat fields and the orchards and the lowing cattle range,*
> *And they're rolling onto victory on this Farmer-Labor train.*

> *Listen to the jingle and the rumble and the roar,*
> *She's rollin' through New England to the West Pacific shore.*
> *It's a long time we've been waitin', now she's been whistling' 'round the bend,*
> *Ride on into Congress on that Farmer-Labor train.*

Woody Guthrie, *The Farmer-Labor Train* (Smithsonian/Folkways 1996).

(Spruill Trust), and, impliedly, (Sojourner) consented and waived any objection to the entry of a final judgment on the merits and therefore this Court finds that the entry of a final judgment will not offend the strictures of *Stern, supra,* and is in compliance with *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) (holding that parties may knowingly and voluntarily consent to final adjudication of a claim by the Bankruptcy Court). Venue is proper under 28 U.S.C. §1409(a).

It is settled that Maryland law must be applied to the substantive dispute. "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). This principal applies whether a federal court is sitting in diversity or addressing state law claims under its pendant jurisdiction. *In re Merritt Dredging Co.*, 839 F.2d 203, 205 (4th Cir. 1988). "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). While out of state cases are cited for their value and wisdom, there is no dispute that Maryland law controls the outcome of this dispute.

**V.    Analysis**

**A.    Summary Judgment Standard**

Fed. R. Civ. P. 56(a), made applicable by Fed. R Bankr. P. 7056, sets forth the procedure to be followed when a party files a motion for summary judgment. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby,*

16

*Inc.*, 477 U.S. 242, 250 (1986).  A material fact is one that might affect the outcome of the suit.  *Id.* at 248.  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In determining the facts for summary judgment purposes, the court may rely on affidavits made with personal knowledge that set forth specific facts otherwise admissible in evidence and sworn or certified copies of papers attached to such affidavits.  Fed. R. Civ. P. 56(c).  Permissible inferences to be drawn from the underlying facts are viewed in the light most favorable to the nonmoving party, but if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment may be granted.  *Miller v. FDIC*, 906 F.2d 972, 974 (4th Cir. 1990).

The Court concludes that there is no genuine dispute of material fact in this adversary proceeding.  The only dispute is whether the pledge of the Farm Property as collateral for a $1.975 million loan[11] fits within the restrictive language of the Farm Deed as an "educational purpose" such that the title to the Farm Property is spared from reversion to the Spruill Trust.  Under Maryland law, the grant language, and the undisputed facts, dictate that the Farm Property's title automatically reverted to the Spruill Trust upon the cessation of agricultural and educational activities and summary judgment in the Spruill Trust's favor must be granted.

## B. Relevant Maryland Real Property Law and its Application to this Dispute.

### (a) Restrictions Upon the Alienability of Real Estate and the Fee Simple Determinable Estate.

*County Commissioners of Charles County v. St. Charles Associates Limited Partnership*, 784 A.2d 545 (Md. 2001), summarizes controlling Maryland law as to the interpretation of restrictions upon the alienability of land.  The Court stated:

---

[11] Sojourner Response in Opp. to SJ Motion at 5.

Prior to 1955, when construing the meaning of covenants a strict construction standard was applicable to promote the free alienability of land. This being so, the principle "that doubt must be resolved in favor of the alienability of land," free and unfettered, was modified and does not always control; "[t]his rule of construction bows always to the more fundamental rule that wherever possible effect will be given to an ascertained intention of the parties." In *Gnau v. Kinlein*, we addressed restrictive covenants when we stated:

"Whether a restrictive covenant is personal to a grantee or a grantor, or to both, or binds their respective successors in title, and so the land by whomever owned from time to time, as well as whether a grantor intended to bind land retained by him, is a question of intention, which may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent."

In *Belleview Construction Co. v. Rugby Hall* . . . [w]e said, "If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted uses of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement." Judge Davidson, writing for the Court of Special Appeals, clearly recognized our holdings in the "restriction" case of *Metius v. Julio*, saying:

"In construing the meaning of a restriction on the use of land, the court must determine the intent and purpose of the parties at the time the agreement was made, *which is a question* of fact. In making that determination the court must consider the language of the instrument itself, giving the words their ordinary meaning unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject manner. Where the language used . . . is ambiguous, the court must also consider the circumstances and conditions affecting the parties and the property *at the time the agreement was made.*

\*       \*       \*

As alluded to, in more recent years, "a 'reasonableness rule' . . . has been engrafted upon the general rule."

18

Currently, Maryland courts no longer apply a pure strict interpretation or construction, but apply rather, a reasonably strict construction when construing covenants. In *Markey,* the Court of Special Appeals, interpreting the position of this Court, adhered to the reasonableness rule when it considered the restrictive covenant at issue in that case. That court stated:

In interpreting words used to create restrictions, *the court should endeavor to ascertain the real purpose and intention of the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction,* as well as from the words used.  In endeavoring to arrive at the intention, the words used should be taken in their *ordinary and popular sense*, unless it plainly appears from the context that the parties intended to use them in a different sense, or that they have acquired a peculiar or special meaning in respect to the particular subject-matter.

*Cty. Commissioners of Charles Co.*, 784 A.2d at 556-59 (citations omitted) (emphasis in original and added).

There is no dispute that the Farm Deed conveyed to Sojourner a fee simple determinable estate interest in the Farm Property.  This type of estate in land is recognized in Maryland and its goal is to guarantee that real estate be used only for a certain purpose, often coupled with a public interest.  But if the specified purpose ceases, title will revert to the grantor or her heirs. *Mayor & City Council of Ocean City v. Taber*, 367 A.2d 1233, 1240 (Md. 1977).  Borrowing from Tiffany's treatise on Real Property, the *Taber* case adopted this description of the fee simple determinable estate:

An estate in fee simple determinable, sometimes referred to as a base or qualified fee, is created by any limitation which, in an otherwise effective conveyance of land, creates an estate in fee simple and provides that the estate shall automatically expire upon the occurrence of a stated event.

\*      \*      \*

19

> No set formula is necessary for the creation of the limitation, any words expressive of the grantor's intent that the estate shall terminate on the occurrence of the event being sufficient. . . . So, when land is granted for certain purposes, as for a schoolhouse, a church, a public building, or the like, and it is evidently the grantor's intention that it shall be used for such purpose only, and that, on the cessation of such use the estates shall end, without any re-entry by the grantor, an estate of the kind now under consideration is created.
>
> *        *        *
>
> If one who has an estate in fee simple creates a determinable fee in favor of another, he has thereafter merely a possibility of re-acquiring the land by reason of the occurrence of the contingency named or indicated, this possibility being know as a possibility of reverter.

*Taber*, 367 A.2d at 1240 (quoting 1 H. T. Tiffany, *The Law of Real Property*, §220 (3rd ed. B. Jones 1939)) (citation omitted). "In case of a diversion of the land from the purpose for which it was devised, the heirs of the testator may be entitled to have the land again by reverter." *Taber*, 367 A.2d at 1240 (quoting *Ringgold v. Carvel*, 76 A.2d 327, 331 (Md. 1950)).

In *Taber*, a tract of Ocean City land had been granted to the Federal Government, subject to a determinable estate, for use only as a Life Savings Station. 367 A.2d at 1237. The deed's habendum clause provided, "that when the United States shall fail to use the said Life Saving Station, the land hereby conveyed for the purpose aforesaid, shall, without any legal proceedings, suit or otherwise, revert to the said Trustees…" *Id.* at 1236. Because the United States "conveyed" the lot in 1967 via quitclaim deed to the Mayor and City Council of Ocean City, the trial court found that the United States, "fail[ed] to use the said Life Saving Station", effective upon the date of the conveyance. Hence, the Court of Appeals affirmed the concomitant decision that the determinable estate had terminated upon the cessation of the Life Saving Station, holding specifically that:

> [W]hen the United States stopped using the property for a
> Life Saving Station, there was a diversion of the land from
> the purpose for which it was conveyed, the estate held by
> the United States was determined, and *automatically* a fee
> simple absolute estate was reestablished in those entitled
> under the original grantors. . . . It was not necessary for
> appellees to assert a claim to the fee simple absolute estate
> or to take any other positive action.  They acquired a fee
> simple absolute estate by the realization of the possibility
> of reverter.

*Id.* at 1242 (citation omitted) (emphasis added).

The outcome described in the above holding is the result sought by the Spruill Trust in this case.  The Spruill Trust contends it is both admitted and undisputed that Sojourner has not conducted any actual agricultural or educational activities at the Farm Property since December 2014, and therefore the Farm Deed's determinable "trip wire" has been cut and the reverter clause irreversibly triggered.  The Spruill Trust asserts that using the Farm Property as loan collateral is not an agricultural or educational purpose, a common-sense argument more or less reliant upon a marriage of reality and plain meaning.  However, to try and fend off a victory for the Spruill Trust, Sojourner musters the following arguments:

a.   On January 22, 2015, Sojourner provided the Farm Property as collateral for the lender Revach in order to secure a previous loan designed to maintain and stabilize operations[12] and secure reaccreditation, and that financial transaction should be deemed to serve an "educational purpose," sufficient to satisfy the restriction of the Deed;

b.   Sojourner's interpretation of the Deed – that the use of the Farm Property as loan collateral is an educational purpose – is correct; but, if the Spruill Trust's more conservative contention is given credence, then the grant language must be deemed ambiguous, requiring discovery and a trial;

---

[12] Sojourner explained that Revach previously loaned funds to the College, secured by the other real property Sojourner owned.  Sojourner was in default under those obligations and pledged the Farm Property as collateral in return for Revach's forbearance as to the existing collateral for the loan.  Sojourner Resp. to SJ Motion at 5.

21

      c.       Maryland has adopted an expansive interpretation of the phrase "educational purposes" when determining tax exemptions and that approach should be applied here with the result that the use of the Farm Property as collateral should be deemed an educational purpose; and

      d.       Sojourner has not abandoned the Farm Property.

Sojourner Mem. in Opp. SJ Motion, Dkt. No. 31.

Each of Sojourner's contentions is based upon the theory that using the Farm Property as loan collateral satisfies the restriction in the Farm Deed and prevents the operation of the reverter clause. However, the Court concludes the restrictive language cannot be interpreted as embracing conversion into "loan collateral" as an educational or agricultural purpose. Because the actual agricultural and educational activities at the Farm Property ceased long ago, and moreover, because Sojourner is now, and has been for several years, *disabled from pursuing such activities as the parties intended*, the reverter clause did become operative before the Main Case was filed and the Farm Property is not, and never was, property of Sojourner's bankruptcy estate.

      (b)     *The Utilization of the Farm Property as Collateral for a "Stabilization" Loan does not Qualify as Use for Educational Purposes in Light of the Intent of the Parties as Gleaned from the Language of the Grant and Relevant Extrinsic Evidence.*

Sojourner relies upon *Atlanta Dev. Auth. v. Clark Atlanta Univ., Inc.*, 784 S.E.2d 353 (Ga. 2016), in support its expansive interpretation of the Deed's restrictive grant. The Court agrees that *Clark University* is similar to this case in several ways but concludes the holding does not deliver victory to Sojourner. The case involved the grant of 3 parcels by the Appellee, Clark Atlanta University (Clark University), itself a college, to another institution of higher learning, Morris Brown College (Morris Brown), both in Atlanta. The grant restricted the use of the parcels to only "educational purposes" and specifically as follows: "[u]ndergraduate work in the

22

fields of the Arts and Sciences, except that nothing in this clause is to be construed as prohibiting [Morris Brown] from offering graduate course in Theology,…" *Clark University*, 784 S.E.2d at 355.  The "determinable" clause provided that if Morris Brown ceased to use the real estate "for the particular educational purposes" identified above, then, "title to said property shall revert to and become vested in the Grantor or its successors." *Id.*  As with Sojourner, Morris Brown was confronted with dire financial problems and filed a Chapter 11 case.  Morris Brown then sought to sell "a large portion" of its campus real estate, including the 3 parcels subject to the restriction. The bankruptcy court approved the sale, but noting however, that the sale was only for, "whatever interest [Morris Brown] has," and that the court was not making any findings as to the nature or viability of that interest.  *Id.* at 356.

The matter turned to the state court through Clark University's filing of a complaint for declaratory relief which sought a ruling that the parcels automatically reverted to it per the reversionary clause when Morris Brown stopped using them for educational purposes and sold them to the Appellant, the Atlanta-Development Authority.[13]  The Appellant countered with the same argument used by Sojourner here, asserting that, the "use" of the property to raise money for the benefit of the institution as a whole was in keeping with a permissible educational purpose under the language of the grant.  The Court disagreed and held as follows:

> [T]he express "use" for the donated Property is that of "educational purposes" as specified in the Deed.  Certainly, as a general proposition, real property may be "used" for educational purposes in many ways, which might in another context include being sold to raise money for educational purposes.  But, the very specific language of the Restriction and the Reverter militate against such a broad construction of use.  As noted, the Restriction provides not only that the Property be used for "educational purposes" but then lists the fields of study which qualify as such "educational

---

[13] The Georgia Supreme Court granted the Appellant an interlocutory appeal of the lower court's denial of its motion to dismiss Clark University's complaint for declaratory judgment.

> purposes." What is more, the Reverter is triggered when grantee
> [Morris Brown] itself ceases to use the Property "for the particular
> educational purposes above set forth" in the Deed. Thus even if
> [Morris Brown's] utilization of the proceeds from the sale of the
> Property could qualify as its "use" of the Property generally for
> educational purposes, this does not address the particularity of
> educational purpose set forth in the Deed. Moreover, once the
> Property is alienated, [Morris Brown] loses control over it for any
> purpose, and as to the sale proceeds, their use and eventual
> exhaustion would be pragmatically impossible to monitor in regard
> to any question of application of Restriction and the Reverter.
> Consequently, in the present circumstances, sale of the Property to
> Invest Atlanta does not qualify as [Morris Brown's] "use" of the
> Property as contemplated in the Deed.

*Id.* at 359.[14]

The Georgia Supreme Court's hypothetical observation that, "in another context", the

sale of otherwise restricted property with the proceeds used for educational purposes, could

satisfy a restrictive grant, is the interpretative "hook" upon which Sojourner hangs its hat.

Indeed, the language in this case, that the Farm Property be used only "for agricultural or

educational purposes," is less precise, and not quite as restrictive, as that in *Clark University*,

where the categories of qualifying educational studies were specifically delineated. However,

the Court concludes that, (a) the reverter clause was triggered as a result of non-use before the

Farm Property became collateral and (b) even if there had been some scintilla of overlapping

required use, the use of the Farm Property as loan collateral was not intended to be an

educational (or agricultural) purpose under the grant language, and that interpretation is

confirmed by relevant, extrinsic evidence.

The very timeline relied upon and affirmed under oath by Sojourner in the Simmons

Affidavit underpins point (a), above. Per Paragraph 11, Sojourner's, "Middle School/Farm

---

[14] *See also Griffis v. Davidson Cty. Metro. Gov't*, 164 S.W.3d 267, 277 (Tenn. 2005) (Supreme Court of Tennessee held that "school purposes" in a deed conveying a fee simple determinable was not limited to classroom instruction but also permitted any use that directly benefited and enhanced the process of learning and instruction).

interaction," with "'at risk'" Anne Arundel County … Middle School boys", that included

tutoring and instruction, "in agricultural and food science … lasted until approximately June 30,

2013." Per Paragraph 3, Sojourner's other agricultural activity at the Farm Property ceased

completely by December 31, 2014. Per Paragraph 12, Sojourner "offered" the Farm Property as

collateral for the loan on January 22, 2015. No other agricultural or educational activity at the

Farm Property has been identified by Sojourner, and although Dr. Simmons was reluctant to

have his testimony "nailed down" at the Creditors' Meeting, he did not identify any such

activity and none has been identified since. That compels the conclusion that all *actual*

educational and agricultural activity, as those terms are commonly understood, ceased before

the Farm Property was "offered" as collateral in January 2015, and that cessation is fatal under

the common law. Per the rule as expressed in Tiffany; "[a]n estate in fee simple determinable

… creates an estate in fee simple and provides that the estate shall *automatically* expire upon

the occurrence of a stated event. . . ." *Tiffany,* §220 at 383[15]; *Taber*, 367 A.2d at 1242 ("…when

the United States stopped using the property for a Life Saving Station, there was a diversion of

the land from the purpose for which it was conveyed, the estate held by the United States was

determined, and automatically a fee simple absolute estate was reestablished in those entitled

under the original grantors") (citing *Seloff v. Naidetsch*, 110 A. 896 (Md. 1920))). Again, the

reverter clause in this case states, "[i]n the event Grantee, its successors or assigns, does not use

the property for agricultural or educational purposes, the title to the property *shall revert* to

Grantor… ." Farm Deed (emphasis added). The Court sees no reasonable impediment to the

---

[15] *See e.g.*, *Arthur E. Selnick Assocs. v. Howard Cty. Md.*, 51 A.3d 76, 93 (Md. App. 2012) (citations omitted); *Knights & Ladies of Samaria v. Bd. of Educ.*, 688 A.2d 933, 936 (Md. App. 1997) ("where land is devised for a certain purpose, and it is the testator's intention that it shall be used for that purpose only, and that on the cessation of such use, *the estate shall end without re-entry by the grantor*, a possibility of reverter arises . . ." (quoting *Ringgold*, 76 A.2d at 331)).

enforcement of this clause to the letter, and as required by law.  Unless there is an express limitation upon the operation of a reverter clause – that a reasonable passage of time must elapse before reversion, or, an opportunity to renew the object of the grant afforded, for example – it functions automatically, which leads to the immediate restoration of title in the grantor, or her successors.  *See* Peters *v. E. Penn Twp. Sch. Dist.*, 126 A.2d 802, 803-04 (Pa. Super. 1956); *Regular Predestinarian Baptist Church v. Parker*,  27 N.E.2d 522, 524 (Ill. 1940).[16]

Moreover, the Simmons' Affidavit acknowledges at Paragraph 4 that, "[t]he educational mission of [Sojourner] *is dependent upon* its accreditation as an institution of higher learning, allowing its students to secure federal student loans to pay its charged tuition." (emphasis added).  Yet, as Sojourner frankly acknowledges in its Response at page 4, "[it] ultimately lost its accreditation on June 30, 2015, because although it satisfied 13 of the 14 accreditation standards it was unable to satisfy the one having to do with institutional resources."  Sojourner Response to SJ Motion at 4.  Sojourner apparently fought hard to retain its accreditation but the battle was ultimately to no avail.[17]  Hence, if its educational mission was dependent upon retaining its accreditation and the same was lost over four years ago, at a time well after the cessation of actual educational or agricultural activities at the Farm Property, how can an unbroken chain of activity supporting a claim to fee simple title be asserted?  In short, without accreditation and the sanctioned and authorized abilities to teach that come with it, Sojourner is,

---

[16] The photographic exhibits of the Farm Property supplied by the Spruill Trust are telling in this regard.  They are a vivid record of forsaken property providing stark evidence of non-use, at least for the portions digitally captured. Spruill Trust Smt. Mat. Facts, Exhs. 5B-1 – 5B-6.  No counterevidence of that nature was submitted by Sojourner.

[17] Accreditation was lost after Sojourner's submission of a plan that had to represent its best effort, and which relied upon the use of the Farm Property as a key financial leverage tool, intended to convince decision makers that it could financially continue with its overall educational mission.  Yet, that plan failed and with it, Sojourner's practical ability to pursue an educational purpose.  This stark set of circumstances is the opposite of the position asserted by Sojourner – the use of the Farm Property as a financial asset did *not* sustain the educational mission.

and has been, disabled from pursuing an educational purpose. Once accreditation was lost, loan proceeds could not be used for educational purposes because Sojourner could not function as an educational institution, and certainly not in the manner it did when the Farm Property was granted to it per the determinable estate. While not specifically listed in the grant, it is only reasonable to conclude that the Grantor would have understood that Sojourner would have had to maintain its ability to function *in toto* as an educational institution in order to retain title to the Farm Property. Yet, that ability melted away several years ago.

*Clark University,* recognizes that the use of proceeds from the sale of a fee simple determinable estate could hypothetically satisfy the condition of the grant language. *Clark University*, 784 S.E.2d at 359. However, the opinion also acknowledges that it would be impossible to monitor the application of the proceeds to insure they are used in a way that satisfies the restriction. In this case, Sojourner did not even attempt to proffer an accounting of the loan proceeds to establish that the money was used for educational purposes. Indeed, there is no evidence at all as to what the loan proceeds were used for and any such evidence would have to be in the custody and control of Sojourner. At best, Sojourner was only able to assert that to the extent an ambiguity is raised by its counter-argument, then discovery should be permitted.[18] But under the circumstances, the Court must conclude that if there were a way to establish that the loan proceeds could be traced to directly support Sojourner's argument, then Sojourner would submit those facts to defend against summary judgment and would not need discovery to do so. But it has not done so, and hence, another sound reason to grant summary judgment in favor of the Spruill Trust becomes apparent.

---

[18] Rule 56(d)(2) permits the non-moving party, upon a proper showing, to obtain additional time to take discovery if it cannot present facts essential to justify its opposition.

27

Finally, to the extent extrinsic evidence is relevant (and helpful) to determine the intent of the restrictive grant, the Simmons Affidavit, and Dr. Simmons' testimony at the Section 341 Meeting, confirm the type of educational and agricultural activity the parties had in mind when the determinable estate was created – actual instruction and interaction with the land itself to primarily impart a knowledge of agricultural and animal husbandry to youngsters, in addition to using the farm's crops to feed students and the poor.  Admittedly, neither the Spruill Trust nor Sojourner provided a wealth of detail regarding the instructional programs that previously existed at the Farm Property.  But the clipped descriptions available make it clear that they were focused upon teaching the students how to cultivate and harvest the fruits of the earth, and the bounty derived from farm animals.  What better proof can there be as to the true intent behind the determinable estate than the actual use to which it was put by Sojourner when the institution was not in a financial crisis?  The language of the Deed does not say the Farm Property was granted for, "agricultural, educational and financial purposes."  To the contrary, it is limited to the first two adjectives and this Court concludes that Maryland Law requires them to be given their commonly understood meanings.  *Gunby v. Olde Severna Park Improvement Ass'n*, 921 A.2d 292, 324 (Md. App. 2007) ("interpreting a deed whose language is clear and unambiguous on its face, the plain meaning of the words used shall govern" (quoting *Drolsum v. Horne*, 691 A.2d 742, 745 (Md. App. 1997))).  As defined by Webster's Dictionary, in this context, the word "used" means, "employed in accomplishing something."  *Webster's Third New International Dictionary* 2524 (Philip Babcock Gove ed. 2002).  "Educational" means, "of, related to, or concerned with education or the field of education." *Id.* at 723.  "Education" means, "the act or process of educating or of being educated."  *Id.*  "Agriculture", is defined by Black's Law Dictionary as, "[t]he science or art of cultivating soil, harvesting crops, and raising

28

livestock."[19] *Black's Law Dictionary* 76 (8th ed. 2004). Finally, the word, "purpose" means, "something that one sets before himself as an object to be attained : an end or aim to be kept in view in any plan, measure, exertion or operation; an object, effect or result aimed at, intended or aimed." *Webster's* at 1847. So, the question to be answered is whether the Farm Property has been employed by Sojourner in accomplishing either (a) the objects of the act or process of educating, or, (b) the science or art of cultivating soil, harvesting crops, and raising livestock, through its use of the Farm Property as loan collateral, or, whether the cessation of activities focused upon those purposes has triggered the reversionary condition. Mindful of the Farm Deed's language, the Grantor's intent, and the commonly understood meanings of the relevant words stated above, the Court cannot find that a purely financial purpose – use as loan collateral to stave off enforcement – is an educational (or agricultural) purpose.

That would neither seem reasonable or rationally in harmony with the common law tradition underlying this type of real estate transaction. Therefore, the Court concludes that the use of the Farm Property as loan collateral is not in keeping with the express purpose of the determinable estate and because those purposes have ceased, the Farm Property automatically reverted as provided under the Farm Deed.

> (c)    The Plaintiff's Interpretation of the Grant Language
> Makes Perfect Sense for the Reasons Set Forth
> Above and as There Is No Ambiguity, There Is No
> Need for Discovery and a Trial.

Sojourner asserts that if the Spruill Trust's interpretation of the language that creates the determinable estate is given "credence" then there must be ambiguity and that would demand discovery and a trial. The Court disagrees and concludes that summary judgment is appropriate

---

[19] As noted in *Balt. Sci. Fiction Soc'y., Inc. v. State Dep't of Assessment & Taxation*, 863 A.2d 969, 974 (Md. 2004), Black's Law Dictionary dropped the term "educational purpose" in later editions after including it in its fifth edition.

for the reasons explained above.  Far from being ambiguous, the language of the Farm Deed is straightforward and easy to understand – the commonly understood meanings of the words "educational" and "agricultural" mesh perfectly with both the Spruill Trust's proffered interpretation, and Sojourner's actual use of the Farm Property, before Sojourner's financial crisis hit.

It is Sojourner's assertion that does not fit either the commonly understood meaning of the words used, or the overall intent as gleaned from extrinsic evidence.  In any event, the Farm Deed does not expressly grant the Farm Property for its financial sturdiness, or, more specifically, to be used as collateral.  Hence, it is incumbent upon Sojourner to demonstrate some evidence to show that the Grantor *intended* to have the words stretched in that manner when the grant was made.  As explained above, since it has failed in that effort, there thus is no ambiguity and no need for discovery and trial.[20]

> (d)   *The Maryland Common Law Interpretation of the Phrase "Educational Purposes" in the Context of Determining Property Tax Exemptions Cannot be Applied to the Restrictive Language before the Court Because to do so Would Violate the Fundamental Rule of Interpretation in this Context.*

Sojourner relies upon three Maryland decisions – *Baltimore Science Fiction Society, Inc. v. State Department of Assessment and Taxation,* 863 A.2d 969 (Md. 2004); *Comptroller of the Treasury v. Maryland State Bar Association, Inc.,* 552 A.2d 1268 (Md. 1989) and *Friends School v. Supervisor of Assessments of Baltimore City,* 550 A.2d 657 (Md. 1988) – which decided the extent to which (a) real property and (b) the entity itself, had to be dedicated to educational purposes in order for tax exemptions to apply.  Each case is fascinating, but they have little to do

---

[20] Sojourner suggests it should be afforded discovery to investigate whether it has any counterclaims.  Sojourner Resp. in Opp. To SJMotion at 13.  Sojourner has had more than ample time to conduct a Rule 2004 examination if the same was warranted but has not done so.  Hence, there is no need to delay the entry of judgment for purposeless discovery.

with the case at bar.  This is so because settled Maryland real estate law controls the outcome

here, as reflected in the analysis set forth in Section V(B)(b) above.  Stated another way, in each

of the cited cases, the courts sought to determine the proper interpretation of the subject

exemption statutes, in light of the legislature's intent.  That intent has no relevance to the

Grantor's intent as reflected in the Farm Deed's language, the circumstances that existed when it

was drafted and the extrinsic evidence weighed above.  The limited purpose here, as required by

Maryland law, was to determine that intent – not the liberal, or conservative, treatment intended

for Maryland taxpayers. Accordingly, those cases can be safely disregarded.

> (e)    *Because the Farm Deed Does Not Use the Word "Abandonment", Cases that Analyze the Nature of Abandonment are Irrelevant to the Analysis.*

As with the tax cases cited above, Sojourner has also cited a line of cases that consider

the question of when real estate has been abandoned.  *See Ochse, v. Henry, et al.,* 2009 WL

8603419 (Md. Cir. Ct. Oct. 29, 2009); *Messersmith v. Mayor and Common Council of Riverdale,*

164 A.2d 523 (Md. 1960); *Cooper v. Sanford Land Co.,* 167 A. 2d 602 (Md. 1961).  *Ochse*

considered a fee simple determinable estate wherein the grant language expressly used the word

"abandoned" as a reversionary trigger.  *Ochse*, 2009 WL 8603419 at *1.  Hence, that case does

not apply to this one.  Neither *Messersmith* nor *Cooper* dealt with fee simple determinable

interests and were limited to analyses of the rules underlying "abandonment".  Hence, none of

the cases have any application to this dispute and as with the tax cases, each may be safely

disregarded.

**VI.**    <u>**Conclusion**</u>

While the Court has great sympathy and compassion for Sojourner's former mission, the plain language of the Farm Deed, and relevant extrinsic evidence, dictates that title to the Farm Property reverted when the estate "determined", as a result of the cessation of agricultural and educational activities.  That means summary judgment must be granted in the Spruill Trust's favor.  A separate order memorializing this ruling shall be entered.

**End of Opinion**